**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEOERGIA
ATLANTA DIVISION**

| | |
|---|---|
| CATHERINE L. GUYETTE, ) | |
| ) | CASE NO: 1:17-CV-04793-MHC-LTW |
| Plaintiff, ) | |
| v. ) | |
| ) | |
| CHARTER COMMUNICATIONS, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT**

**I.   INRODUCTION**

Plaintiff, Catherine "Katie" Guyette will show this Court sufficient evidence that that a reasonable jury could find Defendant, Charter Communications ("Charter") terminated Guyette on the basis of her race, Caucasian by terminating her in violation of the Civil Rights Act of 1871, 44 U.S.C. §1981 ("Section 1981") and Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. §§2000 *et seq.* ("Title VII").  As set out below, Guyette will satisfy the elements of her *prima facie case* by demonstrating she did not violate the workplace rule or policy for which she was terminated, and further to the extent the Defendant administered the rule or policy  as applicable to  Guyette, other similarly situated employees of different

1

races were not disciplined for violating the same rule or policy. Guyette, following her termination, was replaced by an individual from outside Guyette's protected class. Guyette does produce sufficient evidence under the matrix of circumstantial evidence to be shown that Charter's stated legitimate reason for Guyette's termination is pretextual.

## II.   STATEMENT OF UNDISPUTED FACTS

### A. Plaintiff Files Timely Litigation Against Charter.

The EEOC Dismissal and Notice of Rights was processed by the EEOC for mailing on August 23, 2017. The Notice indicates the date of mailing as of that same date however the actual postmark on the envelope by the postal service evidences the actual mail date as August 24, 2017. Accepting the legal presumption in this case, of three days mail time, (not including Sunday, August 27, 2017) the third day, would fall on August 28, 2017. The undersigned's copy of the Notice reflects the date of receipt as August 28, 2017. The filing date of the Complaint, Monday, November 27, 2017 is therefore timely. The undersigned states the first time Plaintiff learned of the Notice of Rights was upon notification of counsel's receipt of the Notice. (See Exhibit A).

**B. Charter Policies Prohibiting Discrimination and Ethics Policies are Applied to Plaintiff in a Discriminatory and Inconsistent Manner.**

The Plaintiff does not dispute the fact Charter maintained Equal Employment Opportunity policies.  Guyette contends the Defendant failed to apply its stated policies in a nondiscriminatory manner as set forth below.  Likewise,  there is no support the stated reason for Guyette's termination under the Charter's Business Ethics and Integrity Standards ethics policy, condoning fraudulent activity related to the Stream Project by  is plausible. [Doc. 15-1, (PI's Dep.) at  19-25; 1-2, pp. 201-2021.

In February 2016, Charter identified three sales districts to undertake the rollout of a special project, (the "Stream Project" or "Roku Project") under the supervision of Kerri Klein, Darrea'l Young, and Katie Guyette, all who held the position of District Sales Supervisor with the responsibility of managing District Sales Representatives ("DSR").

Amanda Fields placed Garland in charge of the Stream Project for all three sales territories including that of Malcolm Brooks, based on  Fields stated lack of confidence in Brooks ability to handle the responsibility

given his personal problems and her concern about his not showing up for work. (Garland Dec., ¶5).

Following initial sales made related to the Stream Project, unusual sales activity was detected across all three sales districts by the number of customer complaints claiming they had not ordered the service, or the costs were misrepresented. (Garland Dec. ¶10). Garland directed the District Sales Supervisors, Klein, Young and Guyette to engage in making in-field audits by contacting customers in person and send in audit reports. (Garland Dec., ¶12).  Garland contacted Guyette, and the two other supervisors and requested phone numbers of the Sales Representatives and informed Guyette that she could tell her Sales Representatives to expect calls and questions concerning the sales complaints on accounts they had been involved in. (Garland Dec., ¶18).

Only Kerri Klein failed to escalate reports and ultimately it was determined all of her Sales Representatives had engaged in fraudulent sales leading to their termination. (Garland Dec., ¶13).  Kerri Klein was not terminated. *Id.*

During the time Garland was assigned to manage the Stream Project, her evaluation was that Katie Guyette had supervised her team as well or better than either Young or Klein. (Garland Dec., ¶23).

### III.   Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . .the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also, Celotex v. Catrett,* 477 U.S. 317, 322 (1986). The facts put forth by a non-movant when responding to a motion for summary judgment are entitled to considerable deference, and the court must draw all reasonable factual inferences in the non-moving party's favor. *See, Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), *McCormick v. City of Fort Lauderdale*, 333 F. 3d 1234, 1243 (11th Cir. 2003).

In *Alexander v. Baldwin County Bd. of Educ.,* 2008 WL 3551194 (S.D. Ala. 2008) (Slip opinion 4-5) the court noted: "To determine whether plaintiff's evidence of pretext is sufficient to create an issue of fact on summary judgment, the district court must evaluate whether the plaintiff has demonstrated „such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence." " (citing *Combs v. Plantation Patterns,* 106 F.3d 1519,

1538 (11th Cir.1997) (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd Cir.1996)).

IV. ARUGMENT

    A. There Are Sufficient Material Facts to Conclude That Plaintiff Has Established A Prima Facie Case.

Congress has dictated that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). Plaintiff does not dispute the same requirements of proof and the analytical framework apply to claims brought under both Title VII and Section 1981. There is no disagreement that after the Plaintiff makes out her *prima facie* case, the Defendant responds to the plaintiff's proof by offering a legitimate, non-discriminatory reason for its action. Thereafter, the inquiry should focus on the ultimate question of whether the defendant intentionally discriminated against the plaintiff." Collado v. United Parcel Service, Co., 419 F.3d 1143, 1150-51 (11th Cir. 2005) (internal quotations omitted). This means that once the defendant puts forth its case, the court will abandon the burden shifting framework derived from McDonnell Douglas Corp. v. Green, 411 U.S. 792,

6

93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and "the case is placed back into the traditional framework – in other words, the plaintiff still bears the burden of proving, more probably than not, that the employer took an adverse employment action against him on the basis of a protected personal characteristic." Collado, 419 F.3d at 1150-51 (internal quotation omitted).

Plaintiff bases her discrimination claim on the fact that Charter ratified the intentional discriminatory acts of Malcolm Brooks (African American), and giving preferential treatment to other similarly situated employees, one Asian and the other African American, leading to the eventual termination of Guyette based on her race (Caucasian). Under the general burden-shifting paradigm of *McDonnell Douglas Corp.*, 411 U.S. at 802 (1973), Plaintiff must first establish a *prima facie* case. To establish a *prima facie* case, the Plaintiff must prove by a preponderance of the evidence (1) that she is a member of a protected class; (2) that she was qualified for the position held; and (3) that she was discharged and replaced by a person outside of the protected class. See *Lee v. Russell County Board of Education*, 684 F.2d 769, 773 (11th Cir. 1982).

### 1. Plaintiff's Prima Facie Case

### a. Plaintiff is a member of a protected class;

It is undisputed that Guyette, (Caucasian) is a member of a protected class amongst her comparators, Kerri Klein and Darrea'l Young, also District Sales Supervisors, who were not terminated although they held comparable positions to Guyette under similar circumstances relating to fraudulent sales in their districts. [Doc. 15-1 (Pl's Dep.) at 5-25, 1-6 pp. 30-31]. Young is an African-American male, and Klein is an Asian female. [Doc 15-1(Pl's Dep.) at 17-23, P. 33].

### b. Plaintiff was qualified for her position;

Relying on the statements provided to Malcolm Brooks by individual employees who were found to engage in fraudulent sales and were the only employees to avoid the fate of termination by charging Guyette with mismanagement, Charter claims it honestly and in good faith had no basis to doubt the veracity of the statements. "Hogwash."

(1) **Failure to provide proper instruction.**

Prior to going live with the Stream Project, Garland instructed the District Sales Supervisors to have all their Customer Sales Representatives available to participate in a conference call during which Amanda Fields

and Garland would introduce the program, and in detail go over the sales process, and requirements necessary to making and recording the sale, including the ethical requirements of confirming an authorized customer only placing the order. (Garland Dec., ¶6). All three district's Sales Representatives received training at the same time and heard the same thing during the conference call and were given an opportunity to ask questions.  (Garland Dec., ¶7).  Garland was satisfied the Sales Representatives were adequately trained during the call which covered all the information which accompanied the presentation from corporate and more. (Garland Dec., ¶). Guyette provided all Stream Project materials to her sales representatives as she had been instructed. [Doc. 15-1(Pl's Dep.) at 2-5, p.83].

(2) **Plaintiff did not improperly coach employees how to answer questions from persons investigating fraudulent Roku Sales**

Guyette was not involved in the formal investigation and has no knowledge of its scope or results. Defendant's Statement of Material Facts, No. 16. Consequently, Guyette would not be aware of the specific questions anyone involved in the investigation would ask.  Prior to the formal investigation starting, Garland requested the three supervisors to engage in fact finding by talking to the sales representatives, conducting customer

9

follow up audits, and providing audit reports. Garland directed the District Sales Supervisors, Klein, Young and Guyette to engage in making in-field audits by contacting customers in person and send in daily audit reports. (Garland Dec., ¶12).  Garland contacted Guyette, and other supervisors and requested phone numbers of the Sales Representatives and informed Guyette she could tell her Sales Representatives to expect calls and questions concerning the sales complaints on accounts they had been involved in. (Garland Dec., ¶18).

    (3) **Plaintiff's encouragement of sales is a pretextual reason for terminating Plaintiff.**

The Stream Project was a roll out sales program and sales goals were established and  closely followed by Charter management.  On March 2, 2016, both Field and Garland promote higher sales numbers and in fact note Guyette as having only half the sales in Kerri Klein's territory, which was being fueled by fraudulent activity engaged in by all sales representatives reporting to Klein.  [See, Email Documents, Plaintiff 000015-000016., Exhibit D].  Conversely, very early in the special sales program, on February 29, 2016, Guyette sends out an email instruction to her sales team to correct any sales method issues resulting in complaints. The letter is used as support that she is covering up fraudulent sales at that time.  [Defendant's Exhibit 5,

page 3]. While during the same time period, the other two territories continue not to question the high sales numbers being produced through fraudulent activity. The fraudulent activity continues to be uncovered on a delayed basis through the time of a manager's summit meeting during the week of March 7, 2016. (Garland Dec., ¶21). Because of the suspected fraudulent activity discovered in Kerri Klein's district due to the high sales numbers being reported, all further sales under the Stream Project were suspended. (Garland Dec., ¶16).

### c. Plaintiff was discharged and replaced by a person outside of the protected class.

Following her termination, Guyette is replaced by Sam Bailey, African-American. [Doc. 15-1 (Pl's Dep. At 13-25, p. 141; Exb. B].

### d. Plaintiff is treated less favorably than similarly-situated comparators.

In February 2016, Charter identified three sales districts to undertake the rollout of a special project, (the "Stream Project" or "Roku Project") under the supervision of Kerri Klein, Darrea'l Young, and Katie Guyette, all who held the position of District Sales Supervisor with the responsibility of managing District Sales Representatives ("DSR"). (Garland Dec., ¶4; Exb D).

11

During the relevant time period, Guyette and Young, (formerly reporting to Brooks) were placed under the direction of Garland for the Stream Project initiative.  Garland Dec., ¶5; Exb D). As a result of the intentional fraudulent activity on the part of sales representatives in the three districts, in the end all of Klein's sales representatives were terminated and all sales representatives engaged in fraudulent sales in Young's district were terminated. [Doc. 15-1 (Pl's Dep. at 21-25, p. 110, at 1,20-22, p. 111; Exb. B]. The three District Supervisors held the same position, working on the same special project, reporting to the same manager- Garland, under the same Regional Director, Amanda Fields.

Training was centralized for all three territories under Garland in a training session before the Stream Project rolled out into the field.  Neither supervisor or field sales representative received more or less introductory training than their peers. As part of the Defendant's investigation, Garland was involved in interviewing the Sales Representatives in the initial and second interviews of the investigation. The consistent response from the representatives was that they had done nothing wrong and/or the customer was lying. (Garland Dec., ¶19, Exb.D). Not one customer representative that Garland interviewed, including Anthony Hicks and Kiara Pauldo, responded

that they had not received proper supervision or had been improperly trained. (Garland Dec., ¶19, Exb.D). The actions of the sales representatives committing fraudulent sales, and in Klein's district it was all representatives, circumvented the sales process. The sales representative actions did not occur because of inadequate training but had that been the reason than all three District Supervisors would be equally culpable of the same act Guyette was terminated for had that actually occurred. Neither Klein or Young suffered termination, and in Klein's territory fraudulent activity was rampant. [Doc. 15-1 (Pl's Dep.) at 4-2, p. 30, Exb. B].

### 2.  Plaintiff presents evidence of pretext related to Charter's non-discriminatory stated reasons for terminating Plaintiff.

The Eleventh Circuit expressly has held that under *Burdine,* there must be either "evidence that asserted reasons for discharge were actually relied on," or "the reasons are not sufficient to meet defendant's rebuttal burden." Lee, 684 F.2d 769, 775 (11th Cir. 1982) (citing *Tanner v. McCall*, 625 F.2d 1183, 1195 n. 21 (5th Cir. 1980), cert. denied, 451 U.S. 907, 101 S. Ct. 1975, 68 L. Ed. 2d 295 (1981)). Merely articulating a legitimate non-discriminatory reason is insufficient to sustain the Defendant's burden. The reason also must

be supported by admissible evidence. Defendant cannot meet its burden of production merely by reciting non- specific reasons. *See, Increase Minority Participation by Affirmative Change Today, Inc. [IMPACT] v. Firestone*, 893 F.2d 1189, 1194 (11th Cir. Fla. 1990). Under Charter's general ethics policy, the specific reason stated for Guyette's termination was "condoning fraudulent conduct." In a short time cycle, all three sales districts were subject to fraudulent activities by sales representatives, and the only reliable evidence presented against Guyette contained in the investigative report is her February 29, 2017 letter telling her team, let's do this the right way.

As it pertains to termination decisions, the Courts have recognized that the "'cat's paw theory" may be utilized by the plaintiff to prove "that the discriminatory animus behind the recommendation caused the discharge . . . if the plaintiff shows that the decision maker followed the biased recommendation without independently investigating the recommendation. *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999). "In such a case, the recommender is using the decision maker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.* Essentially, where the individual accused of discriminatory animus is "an

integral part" of a multi-level personnel decision, their improper motivation may "taint[ ] the entire . . . process." *Schoenfeld v. Babbitt*, 168 F.3d 1257, 1268 (11th Cir. 1999).

There is not any question, Malcolm Brooks, was integral to the decision to terminate Guyette. He was no small cat, he carried significant weight with recommending manager, Amanda Fields. Statements made to Malcolm Brooks critical of Katie Guyette were made by employees who were facing termination and inconsistent with their prior investigation statements in which Garland participated. (Garland Dec., ¶24, Exb. D) Garland had previously placed Anthony Hicks on final warning for fraudulently reporting sales. *Id.* at 25. Malcolm Brooks had several times told Garland that he needed a position open in order to hire his friend, Sam Bailey, a black male. *Id.* at 26.

With one exception, it was Garland's observation all the Sales Representatives hired by Malcolm Brooks were African American and mostly female. *Id.* at 27. Stacia Erway has stated to Garland that in reference to Malcolm Brooks, that he is "out in left field," and don't know how much longer he is going to be working for us. *Id.* at 28.

Notwithstanding, Amanda Fields has made it known she would protect Malcolm Brooks, stating she would fire everyone before anything happened to Malcolm. *Id.* at 29.

Further, Garland has been called upon and conducted, at the request of Amanda Fields, several unrelated employee investigations and the standard process consists of conducting two employee interviews, (1) to give the employee an opportunity to respond to the issues raised and (2) a meeting to present the result of the investigation to the employee. *Id.* at 17. Garland had been informed by Amanda Fields when conducting investigations, Charter took a position that text messages on personal phones could not be used as evidence because lack of context. That applies here as the context is lacking as to time and purpose of the statement. Furthermore, Brooks interviews with the employees were taken outside the time frame of the Investigation Report, April 27, 2017.

Garland was not involved in the decision to terminate Katie Guyette, but as it relates to this matter it has been her experience the investigative reports are slanted to support the desired outcome. *Id* at 31. Decisions to terminate are based on the manager's recommendation and are reviewed only

by the designation, "approved" or "disapproved" to indicate the decision was made by the recommending manager. *Id* 32.  In this case it was Brooks who, as Guyette's immediate manager made the initial recommendation.

## V.     CONCLUSION

Here, given the matrix of circumstantial evidence, there is sufficient doubt placed on Charter's proffered legitimate, nondiscriminatory reasons for its employment actions, such that a jury reasonably could conclude that the proffered reasons were not what actually motivated Charter's action.  There is sufficient evidence to show Brook's own racial discriminatory animus to show that the real reason motivating the decision to terminate Guyette was discriminatory.

The Plaintiff hereby respectfully requests the Defendant's Motion for Summary Judgment be denied.

This the 8th day of February 2019.

/s/Howard R. Evans
Howard R. Evans
Ga. Bar No. 292865

Howard R. Evans & Associates
The Waterford, Suite 216
4488 North Shallowford Road
Atlanta, Georgia 30338
(770) 377-9521
Email:  attorney4hrlaw@gmail.com

## RULE 7.1(D) CERTIFICATE

The undersigned counsel certifies that this document has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(B).

Respectfully submitted, this the 8th day of February, 2019.

/s/Howard R. Evans
Howard R. Evans
Ga. Bar No. 292865

## CERTIFICATE OF SERVICE

This is to certify that I have on this day electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will automatically give notification of such filing to all attorneys of record for Defendant.

Respectfully submitted, this the 8th day of February, 2019.

/s/Howard R. Evans
Howard R. Evans
Ga. Bar No. 292865